RYMER, Circuit Judge,
dissenting as to Section VLB.:
Timeliness of the adult claims hinges on the discovery rule. Under the California statute of limitations, adults had one year from the date of injury to bring their action. They concede their injuries occurred outside that period. Instead, adult limitations plaintiffs submit, they did not know, and should not have known, of the facts giving rise to their cause of action earlier than a year prior to filing. Thus, in their view, the discovery rule is triggered and either they should win outright or, at a minimum, they have raised triable issues of fact that require a trial.
We considered similar issues in O’Connor v. Boeing N. Am., Inc., 311 F.3d 1139 (9th Cir.2002). There, plaintiffs alleged that hazardous substances released from nuclear and rocket testing facilities at Rocketdyne caused their latent illnesses. Recognizing that the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), retains state statutes of limitations, we held that CERCLA nevertheless establishes a federal standard for when delayed discovery of a plaintiffs claims will toll the California statute of limitations because the federal standard is more generous than the state rule. The federal standard turns on whether plaintiffs knew or should have known more than one year before filing that contamination was the cause of their injuries.
It is undisputed for purposes of summary judgment that limitations plaintiffs did not know of their claims more than a year before they filed. Therefore, the question is whether they reasonably should have known of them. A two-step analysis guides this determination: “First, we consider whether a reasonable person in Plaintiffs’ situation would have been expected to inquire about the cause of his or her injury. Second, if the plaintiff was on inquiry notice, we must determine whether [an inquiry] would have disclosed the nature and cause of plaintiffs injury so as to *846 put him on notice of his claim.” Id. at 1150 (internal citation omitted). The objective is “to evaluate when a reasonable person would have connected his or her symptoms to their alleged cause.” Id. Plaintiffs bear the burden of proving entitlement to the discovery rule.
In O’Connor, plaintiffs argued that the one-year limitations period did not begin to run until they discovered their claims when UCLA released an epidemiological study concluding that employees at one of the defendant’s facilities were at increased risk of cancer. They pointed out that there was publicity before the UCLA study about other causes of cancer. The defendants (and the district court, applying the California “suspect or should suspect” test), on the other hand, believed that reports of contamination at the Rocketdyne Facilities, and news reports of contaminant studies at those facilities, nullified any suspicion that other causes might have been the source of their illness. We disagreed, holding that whether plaintiffs were on inquiry notice, in light of the evidence presented, was fundamentally a question of fact. Id. at 1154. Among other things, we noted that until the UCLA findings were released, one could reasonably infer that plaintiffs relied on public statements that there was no immediate health threat to the community, and that a reasonable plaintiff would have imputed the cause of illness to sources other than the Rocketdyne facilities. Under these circumstances, we also thought there were triable issues of fact as to when plaintiffs could have tested the potential causes of their diseases so as to disclose their nature and cause. Thus, we concluded, a jury must decide whether to impute knowledge of the contamination to plaintiffs, whether they were on inquiry notice, and when they had the means to discover the facts to support their claim.[1]
In light of O’Connor, limitations plaintiffs argue that the district court in this case erred in relying on the mere existence of media reports which could not furnish them with constructive knowledge of what the reports said.[2] They contend, in addition, that the articles were equivocal in what they said about the harm caused by Remco, like the articles in O’Connor. Further, many of the limitations plaintiffs aver they did not subscribe to newspapers, didn’t pay attention to local news, and were unaware of being at risk from Remco contamination; they did not know about and had not attended public meetings regarding any contamination caused by Remco; and they hadn’t seen or heard of any legal documents or notices about contamination posing a health problem. A number said they learned that contamina *847 tion might be a cause of their health issues from a friend or family member, and some said they learned from a newspaper or meeting, within the year. Finally, limitations plaintiffs say that public agencies and the Willits Trust gave assurances there was no cause for concern.
Whitman produced evidence of hundreds of newspaper articles in the Willits News, the Ukiah Daily Journal, and The Press Democrat starting in 1979 that discussed Remco, chromium, and contamination. The district court considered these articles, but did not rely solely on them. In addition, the court considered the fact that public meetings were held on April 17, 1997, October 19, 1999, and January 15, 2000 where Remco contamination, the cleanup, and possible health risks to the community were discussed. Also, many Willits residents, including some of the plaintiffs or their relatives, were individually warned about exposure to Remco contamination. For example, in March 1991 the County of Mendocino Department of Public Health posted a sign at residences, a school, and a hospital in Willits directing those who owned or operated a water well within 1000 feet of Remco not to drink water from the well until it was tested for contamination. Other notices were given in December 1997, January 1998, July 1998, and August 1999.
The district court further took into account publicized lawsuits regarding Rem-co-related contamination. The first was the City’s 1996 suit against Remco that resulted in a consent decree and formation of the Willits Trust.[3] The Willits Trust established a document depository at the Willits Library to make documents relating to Remco contamination available to the public. The Trust also set up a community hotline for information and, starting in June 1998, distributed fact sheets about the contamination. The Avila action was brought on August 23, 1999 and there were public notices, meetings, and newspaper articles about the suit both before and after it was filed. Shortly after this, in September 1999, Donna Avila conducted a survey on the health of all Willits citizens within a half mile radius of the Remco plant. The survey sought information about contamination and any resulting health effects. And she spoke about health concerns at a public meeting in October 1999.
The court held that although none of these sources by itself would be sufficient to impute knowledge to limitations plaintiffs, the aggregation of information indicates that at least some of them should have known about the Remco contamination and health dangers it posed. Set against this, the court found the declarations they submitted conclusory and inadequate to carry their burden of showing they lacked any reason to know their injuries were caused by Remco contamination. Although the court believed it was plausible that many residents were unaware of the health risks for a long time, in its view it would be unreasonable to infer that this remained so once the Avila suit was filed. Accordingly, summary adjudication was granted as to those plaintiffs who filed after August 24, 2000.[4]
I agree that a reasonable person in the Willits community of 5000 residents, given this evidence as a whole, could have been *848 expected to inquire about the cause of injury no later than the immediate aftermath of the Avila lawsuit. See O’Connor, 311 F.3d at 1150-51. Unlike the plaintiffs in O’Connor, who contended it was unreasonable to infer they should have inquired about whether contamination caused their illnesses until the results of the UCLA study became public, limitations plaintiffs point to no similar fact — or pending study on which they were waiting — that would have put them on notice within a year of their filing.
Even if they should have inquired, limitations plaintiffs maintain that it would have led to naught because the news reports were inconclusive on whether chemicals released by Remco caused their harm. However, they actually brought suit based on the same mix of information. That is, they did not wait for a definitive study as the O’Connor plaintiffs did, but made the connection between symptoms and cause on tips that there “may” be one. Had they pursued the question before a year before filing, the same information that satisfied Avila was there to discover.
In sum, evidence that limitations plaintiffs lacked subjective knowledge that they were at risk from Remco contamination does not carry their burden of establishing a triable issue of fact with regard to whether the discovery rule applies. They are charged with knowing facts they would have discovered upon inquiry, and thus with knowledge that many residents of Willits believed they had been injured by the release of hazardous substances at Remco. As this was discoverable no later than the filing of the Avila suit and its immediate aftermath, the only reasonable inference is that limitations plaintiffs knew enough to proceed more than a year before they did.
I would, therefore, affirm on this issue as well. Given my position on this issue, the costs award would not be moot. I would uphold it as well, in that the district court did not abuse its discretion.

. We upheld summary judgment against a number of plaintiffs who filed before release of the UCLA report but who offered no evidence of facts that they contended put them on notice.

. They also rely on Nelson v. Indevus Pharmaceuticals, Inc., 142 Cal.App.4th 1202, 48 Cal.Rptr.3d 668, 671 (2006), holding that suspicion necessary to trigger the discovery rule cannot be imputed and that the plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate. This just restates the California rule, articulated in Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923, 927-28 (1988), however, and isn't controlling under the federal standard that applies to this case. Limitations plaintiffs also point out that in 2003 California enacted a statute specifically providing that “[mjedia reports regarding the hazardous material or toxic substance contamination do not, in and of themselves, constitute sufficient facts to put a reasonable person on inquiiy notice that the injury or death was caused or contributed to by the wrongful act of another.” Cal.Civ.Proc.Code § 340.8. But there is no need to consider the effect of this statute here, because the district recognized media reports alone would not suffice.

. Another suit was brought in the 1990s, alleging that Forest Hernandez died as a result of ingesting water contaminated by Remco.

. The Arlich action was not filed until January 16, 2001. More than a year earlier, Avila and a hundred others filed suit, her health survey was taken, and health concerns arising out of Remco contamination were publically discussed.